817 So.2d 1269 (2002)
Linda HARBOR
v.
ST. FRANCES CABRINI HOSPITAL.
No. 01-1551.
Court of Appeal of Louisiana, Third Circuit.
May 15, 2002.
Eugene A. Ledet, Jr., Rivers, Beck, Dalrymple & Ledet, Alexandria, LA, for Plaintiff/Appellee: Linda Harbor.
Kathryn Fowler Van Hoof, VanHoof & Associates, LeCompte, LA, for Defendant/Appellant: St. Francis Cabrini Hospital, Inc.
Court composed of NED E. DOUCET, JR., Chief Judge, ULYSSES GENE THIBODEAUX, and MICHAEL G. SULLIVAN, Judges.
MICHAEL G. SULLIVAN, Judge.
In this workers' compensation case, St. Frances Cabrini Hospital (Cabrini) appeals *1270 a judgment in favor of Linda Harbor ordering it to pay $2,000.00 in penalties and $1,500.00 in attorney fees for its delay in authorizing an examination by Ms. Harbor's choice of orthopedic surgeon, Dr. Stuart I. Phillips, and to pay $2,000.00 in penalties and $3,500.00 in attorney fees for its failure to authorize surgery that Dr. Phillips later recommended. The judgment also ordered the authorization of that surgical procedure. Ms. Harbor has filed an answer in this court, seeking additional attorney fees for defending Cabrini's appeal.

Discussion of the Record
Ms. Harbor, a housekeeper at Cabrini, was injured on October 15, 1998, when she felt a "pop" in her lower back as she lifted a trash bag weighing between twenty-five and thirty-five pounds. She was immediately seen in Cabrini's emergency room, where she was given medication after x-rays revealed degenerative changes bilaterally in the sacroiliac joints, but no fracture or subluxation. On October 19, 1998, Ms. Harbor was seen by Dr. Robert Rush, a specialist in occupational medicine, with complaints of pain across her lower back that radiated down her right leg below the knee. Diagnosing a lumbar strain, Dr. Rush prescribed physical therapy and medications for inflammation and spasm.
On December 15, 1998, a vehicle in which Ms. Harbor was riding as a passenger was struck from behind.[1] She returned to Dr. Rush on December 22, 1998, complaining of headaches and pain from her neck down to the lower back. Dr. Rush noted that Ms. Harbor had improved since her first accident, but that she was still having sacroiliac problems at the time of the motor vehicle accident. Dr. Rush believed that the automobile accident was mostly responsible for Ms. Harbor's neck problems, but that it possibly aggravated her lumbar and sacroiliac problems. He recommended continuation of physical therapy and medications.
Before the automobile accident, Cabrini had scheduled an appointment for Ms. Harbor with its choice of orthopedic surgeon, Dr. Gregory Gidman, for December 16, 1998.[2] Dr. Gidman reported an essentially normal orthopedic exam, but recommended an MRI of the lumbar spine to rule out any intraspinal pathology in light of her radicular symptoms. If the MRI revealed no pathology, then Dr. Gidman would encourage a return to light-duty work, with maximum lifting of twenty pounds and avoidance of prolonged positions and repetitive motions. On January 11, 1999, Ms. Harbor underwent an MRI at Rapides General Hospital. That test revealed mild degenerative changes at L5-S1 with some posterior bulging, slightly worse on the right, that only minimally impinged upon the anterior thecal sac.
On April 12, 1999, Ms. Harbor returned to Dr. Rush, reporting that physical therapy resulted in increased pain with no resolution of her back, hip, and right leg problems. Dr. Rush observed good range of motion in the cervical and lumbar spines, but he also noted tenderness over the right sacroiliac area and tightness of the right piriformis muscle. Dr. Rush believed that *1271 Ms. Harbor was at an impasse with regard to her sacroiliac dysfunction after extensive physical therapy and reconditioning programs. Because the MRI indicated abnormalities that need to be addressed, Dr. Rush recommended a consultation with Dr. Phillips, an orthopedic surgeon that he described as having "expertise in the evaluation and treatment of Sacroiliac Dysfunction." Dr. Rush mailed a copy of this request, dated April 14, 1999, to Cabrini's adjusting firm.
On May 12 and June 8, 1999, counsel for Cabrini requested that Ms. Harbor sign a release for her medical records. On June 16, 1999, Ms. Harbor's counsel forwarded the requested releases. On July 8, 1999, Ms. Harbor filed a disputed claim seeking penalties and attorney fees for the failure to approve a visit with Dr. Phillips.
Although the record does not reflect when Cabrini approved the visit with Dr. Phillips, he did examine Ms. Harbor on July 22, 1999. On that date, Ms. Harbor complained of severe low back pain radiating through the right hip, thigh, lower leg, and foot, with weakness in the leg and numbness and tingling in both feet. She also complained of bowel difficulty and moderate cervical spine discomfort. Dr. Phillips reported an abnormal lumbar exam that included only fifty percent of lumbar flexion, the inability to walk on heels and toes, and marked tenderness in the lumbosacral area, particularly in the right sacroiliac joint. He interpreted x-rays as revealing a superior subluxation of the right sacroiliac joint. Dr. Phillips believed that Ms. Harbor suffered from dysfunction in both the lumbar and sacroiliac areas, but because of the proximity of these regions, he could not determine which one was the source of her pain. Before making a specific diagnosis, he requested that Ms. Harbor undergo a lumbar discogram, CT scan, and sacroiliac arthrogram.
Ms. Harbor underwent the requested testing on October 6, 1999 and November 19, 1999. Based upon the results of these tests, Dr. Phillips concluded that the lumbosacral area was the major pain generator due to a herniated disc. He then recommended an anterior discectomy and fusion at L5-S1 followed by a vigorous rehabilitation program. If this treatment were not successful, he would then consider performing a second surgical procedure, a sacroiliac stabilization. On a visit of January 27, 2000, Dr. Phillips noted that he was still awaiting approval of surgery. He also recorded increased back pain and bilateral hip pain, with marked mechanical findings, including spasm and restricted range of motion.
In January of 2000, Cabrini attempted to schedule a return visit with Dr. Gidman. An appointment was scheduled for January 18, 2000, but, according to Mr. Harbor's attorney, Dr. Gidman's staff was "rude and unprofessional" when his client arrived a few minutes late, and she was not permitted to see the doctor. After that incident, her attorney informed Cabrini that she would not return to Dr. Gidman's office. Cabrini then scheduled an appointment for a case manager to meet with Dr. Gidman about Ms. Harbor's status, but Dr. Gidman declined to participate in that meeting upon objection of Ms. Harbor's counsel.
On April 3, 2000, Cabrini filed a motion and order seeking direct communication with a healthcare provider pursuant to La. R.S. 23:1127. Ms. Harbor responded by requesting a stay prohibiting such communication pending her challenge to the constitutionality of La.R.S. 23:1127 in district court. The workers' compensation judge granted the requested stay pending the outcome of the district court proceeding, and on March 19, 2001, the district court rejected Ms. Harbor's challenge.
*1272 In the meantime, Ms. Harbor did return to Dr. Gidman on March 30, 2000. Dr. Gidman reported findings that were much improved since Dr. Phillips' examination in July of 1999. He did not detect any spasm and recorded good heel/toe strength, although he noted some pulling and pain in the low back with these maneuvers. He also referred to the reports of a psychiatrist that had diagnosed Ms. Harbor with a tendency to aggravate her underlying physical pathology. Because Dr. Phillips had diagnosed a herniated disc, Dr. Gidman recommended a lumbar myelogram followed by a CT scan. If these tests did not reveal any neurocompression, then Dr. Gidman believed that the surgery recommended by Dr. Phillips would only possibly, but not probably, give some relief. The testing recommended by Dr. Gidman has never been performed.
Ms. Harbor returned to Dr. Phillips on March 20, 2000 and July 25, 2000. He opined that she "definitely needs surgery" in light of her increasing pain, decreased strength and sensation in the right lower extremity, marked spasm, and swelling in all four extremities.
On August 18, 2000, Ms. Harbor filed another disputed claim seeking authorization of the surgery recommended by Dr. Phillips, as well as penalties and attorney fees.[3] By agreement, all claims were submitted on briefs and documentary evidence on July 18, 2001. On August 22, 2001, the workers' compensation judge ruled in open court that Cabrini did not reasonably controvert Ms. Harbor's entitlement to a visit with Dr. Phillips as well as the treatment that he recommended and awarded the penalties and attorney fees as described above.

Initial Orthopedic Examination
In its first assignment of error, Cabrini argues that the workers' compensation judge erred in penalizing it for the delay in approving the initial visit to Dr. Phillips because Ms. Harbor hindered its investigation by not immediately executing the requested releases for her medical records. Cabrini points out that it approved the visit within twenty-one days of receiving the records from all of Ms. Harbor's treating physicians. Cabrini also argues that no statute prescribes "the period of time within which the employer must authorize treatment in advance." In its oral reasons for judgment, the workers' compensation judge rejected these arguments, finding that Cabrini was not justified in delaying approval for Ms. Harbor's initial orthopedic consultation when it had already sent her to the orthopedic surgeon of its choice, Dr. Gidman.
Under La.R.S. 23:1203(A), the employer is required to "furnish all necessary... medical and surgical treatment" in any compensable claim. La.R.S. 23:1201(E) provides: "Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof." La.R.S. 23:1201(F) subjects the employer or the insurer to penalties and attorney fees for failure to provide timely "payment" unless the claim is reasonably controverted or unless nonpayment results from conditions beyond its control. The determination of whether an employer or an insurer should be cast with penalties and attorney fees is a question of fact that will not be disturbed absent manifest error. Harrington v. Hebert, 00-1548 (La.App. 3 Cir. 5/23/01); 789 So.2d 649.
*1273 In Gay v. Georgia Pacific Corp., 32,653 (La.App. 2 Cir. 12/22/99); 754 So.2d 1101, the second circuit recognized that an employer's failure to authorize a necessary medical procedure is deemed to be a failure to furnish the benefits required by La.R.S. 23:1203. In such a case, the employer is subject to the sanctions of La. R.S. 23:1201(F), even though that statute refers to the "[f]ailure to provide payment." (Emphasis added.) See Sims v. Sun Chemical Corp., 34,947 (La.App. 2 Cir. 8/22/01); 795 So.2d 439. This court has, likewise, consistently applied the sanctions of La.R.S. 23:1201(F) for the failure to authorize a medical treatment or procedure that is subsequently deemed necessary. See, e.g., Duvall v. St. Francis Cabrini Hosp., 01-905 (La.App. 3 Cir. 12/28/01); 805 So.2d 418; Dozier v. Garan's, Inc., 94-1363 (La.App. 3 Cir. 4/05/95); 653 So.2d 137.[4] Thus, the period of time in which the employer or insurer must act is sixty days, as provided in La.R.S. 23:1201(E).
Cabrini argues that it reasonably controverted the need for the consultation with Dr. Phillips because Ms. Harbor waited fifty-eight days before executing a medical release form. Cabrini contends that a medical release was particularly important in this case in light of the intervening automobile accident. Had Cabrini not already sent Ms. Harbor to its orthopedic surgeon of choice, we might have found these arguments persuasive.
Under La.R.S. 23:1121(B), an employee has the right to select one treating physician within any field or specialty. Once that choice has been made, the employee must obtain prior consent to change physicians within that specialty, but the employee is not required to obtain prior approval for a change of treating physician in another specialty. Ms. Harbor's initial choice of treating physician was Dr. Rush, an occupational medicine specialist. After several visits, Dr. Rush concluded that an orthopedic evaluation was required because of her failure to improve. Cabrini, however, had already sent Ms. Harbor to its choice of orthopedic surgeon four months before Dr. Rush made his recommendation. Under these circumstances, we fail to see how Cabrini has reasonably controverted Ms. Harbor's right to see an orthopedic surgeon of her choice, when, under La.R.S. 23:1121(B), she did not need Cabrini's approval to switch to a treating physician in another specialty. We find no error in the award of penalties and attorney fees for the delay in authorizing an evaluation by Dr. Phillips.

Authorization of Surgery
In its remaining assignments of error, Cabrini argues that the workers' compensation judge erred in finding that Ms. Harbor proved the necessity of the surgery recommended by Dr. Phillips. Cabrini also argues that the workers' compensation judge erred in penalizing it for failing to approve the surgery, when it could not fully investigate the claim because of the stay order pending the constitutional challenge to La.R.S. 23:1127. In rejecting these arguments, the workers' compensation judge noted that Cabrini failed to follow through with the testing recommended by its physician of choice and that Cabrini had other avenues of discovery that it chose not to pursue.
In Campbell v. Gootee Construction Co., 99-913, p. 7 (La.App. 5 Cir. 1/12/00); 756 *1274 So.2d 449, 543 (citations omitted), the court stated:
In order to establish a claim for medical benefits, a claimant must show by a preponderance of the evidence that, 1) the benefit is occasioned by the work related accident to a reasonable certainty, and 2) that a particular medical expense is necessary. A hearing officer's determination of whether a medical expense is necessary and occasioned by a work related accident are factual questions. The manifest error-clearly wrong standard of appellate review applies in worker's compensation cases.
Cabrini's arguments regarding entitlement to surgery as well as the penalties and attorney fees imposed concern the effect of the stay order issued by the workers' compensation judge. Cabrini contends that because the district court never signed a judgment on its ruling as to the constitutionality of La.R.S. 23:1127, the stay order was never lifted. Therefore, "Cabrini has neither approved [n]or disapproved the recommendations and is simply waiting for the `stay' order to be lifted ... to continue their medical investigation."
Cabrini filed its motion for direct communication with a healthcare provider after Ms. Harbor refused to return to Dr. Gidman. (Ms. Harbor did, in fact, submit to a second examination by Dr. Gidman on March 30, 2000.) The stay order subsequently issued affected only Cabrini's motion to directly speak with Dr. Gidman. After the district court rejected Ms. Harbor's constitutional challenge, her counsel sent Cabrini a judgment on that ruling to be signed, but there is no evidence as to what happened to that judgment. Further, the workers' compensation judge did not consider the absence of a signed judgment from the district court as an impediment to ruling on the disputed claims filed by Ms. Harbor.
Cabrini seems to argue that, because it was temporarily prohibited from speaking directly with Dr. Gidman, it could cease all activity in this file. We disagree. The stay order affected only one aspect of its investigation; hence, the workers' compensation judge was correct in stating that Cabrini had other methods of discovery at its disposal. Cabrini sought a meeting with Dr. Gidman only after Ms. Harbor refused to see him again, yet she subsequently did submit to a second examination. If Cabrini still considered a meeting with Dr. Gidman as vital to its investigation, it could have easily lifted the stay upon learning of the district court's ruling and rescheduled its motion to order a direct communication.
Dr. Phillips first recommended surgery in November of 1999. His recommendation was based upon the results of a discogram and an arthrogram, as well as Ms. Harbor's increasing complaints. When Dr. Gidman reexamined Ms. Harbor on March 30, 2000, he recommended additional testing of a myelogram and CT scan. These tests were never performed. Even if these tests were negative, however, Dr. Gidman admitted the possibility that the surgery proposed by Dr. Phillips would alleviate some of Ms. Harbor's symptoms. In its brief, Cabrini raises the issue of causation in light of the subsequent accident in December of 1998, yet it has not placed any evidence concerning this accident in the record. On this record, we cannot conclude that the workers' compensation judge erred in ordering the authorization of surgery and in the sanctions imposed for Cabrini's failure to do so.

Answer to Appeal
Ms. Harbor has filed an answer, seeking an increase in attorney fees for defending Cabrini's appeal. At trial, the workers' compensation awarded a total of $5,000.00 *1275 ($1,500.00 for the delay in authorizing Dr. Phillips' initial visit and $3,500.00 for the failure to authorize the recommended surgery).
In Sims, 795 So.2d at 443 (citations omitted), the court stated the following regarding an increase in attorney fees on appeal:
The general rule is an increase in attorney fees is usually allowed where a party was awarded attorney fees by the trial court and is forced to and successfully defends an appeal. However, even though requested, additional attorney fees may not be granted where the appellate court finds that the amount awarded in the trial court was sufficient to compensate counsel for both the work at the trial court and the appellate court levels.
The court in Sims found that an award of $3,500.00 in attorney fees at trial was sufficient to compensate for work performed on appeal, where only one witness was called at trial and there was no indication that any depositions or other formal discovery was taken. In the present case, Ms. Harbor filed three disputed claims, two of which were successful. There was no trial, as all claims were submitted on briefs and documentary evidence that consisted of medical reports and correspondence between counsel. No depositions were taken. Under these circumstances, we find $5,000.00 sufficiently compensates Ms. Harbor for trial and appeal of this matter.

Decree
For the above reasons, the judgment of the trial court is affirmed. Ms. Harbor's request for additional attorney fees on appeal is denied. Costs of this appeal are assessed to St. Frances Cabrini Hospital.
AFFIRMED.
THIBODEAUX, J., concurs in part and dissents in part and assigns written reasons.
ULYSSES GENE THIBODEAUX, J., concurring in part and dissenting in part.
I fully concur in the majority's opinion except with respect to its failure to award attorney fees for the work performed on appeal. Given the results obtained by Ms. Harbor's attorney and the fact that he was compelled to defend his work and the results obtained on appeal, I would award an additional $2,500.00 in attorney fees in response to the claimant's request for additional fees on appeal.
NOTES
[1] The record contains some discrepancy as to the date of this accident. In his medical records, Dr. Rush consistently refers to a motor vehicle accident of December 16, 1998. However, Cabrini emergency room records indicate that Ms. Harbor underwent x-rays for an "MVA" on December 15, 1998.
[2] Although the automobile accident occurred on December 15, 1998 (according to the Cabrini emergency room records), Ms. Harbor did not report that event to Dr. Gidman at his examination of December 16, 1998. (Dr. Gidman's records also contain a discrepancy, in that his typed report states that the examination occurred on December 17, 1998, but the report is dated December 16, 1998.)
[3] Ms. Harbor had also filed a third disputed claim concerning the delay in authorizing a "body massager" prescribed by Dr. Phillips. She has not appealed the denial of that claim.
[4] But see Howard v. Our Lady of the Lake Reg'l Med. Center, 99-1826 (La.App. 1 Cir. 9/22/00); 768 So.2d 293, in which the first circuit concluded that the sanctions of La.R.S. 23:1201(F) apply only when the employer or insurer fails to provide reimbursement for expenses already incurred and not for the failure to approve medical treatment.